Good morning, Your Honors. Jason Carr, appearing on behalf of Appellant Catarino Sanchez. This case involves a stop by a Nevada Highway Patrol Interdiction Task Force. And it's helpful to break the stop up into two components, much like the magistrate court did in its report and recommendation. There's a traffic stop component to the whole incident, and there's also a criminal investigation component. What the magistrate court found, and we believe this is an accurate assessment of the law, is that once the highway patrol guy found everything in order, told Mr. Sanchez that he was not going to cite him, and said, okay, we're done here, that ended the traffic stop encounter. Now, in the traffic stop encounter, we don't have much of a problem with what highway patrol did. Everything appears to comport with the Fourth Amendment, with one exception. You notice on the first line of the excerpt, on page 92, Roselle Owens, the Nevada Highway Patrol officer, asks Mr. Sanchez to exit the vehicle. He notices he has some kind of bulge in his front pocket, asks to pat him down. He does so, and what Mr. Owens says is, I could tell that it wasn't a weapon. Right, he had $3,500 in cash on him. He said, I could tell that it wasn't a weapon, but then he goes ahead and asks him what it is. I would submit, at that point, that particular question exceeded the scope of the traffic stop. This is a traffic stop about a cracked windshield and a GPS or video monitor display. It had nothing to do with the bulge in his pocket. Now, the officer certainly had some latitude to investigate whether or not there was a threat to officer safety. And that he did. He asked him to get out of the vehicle. He did the pat down and determined that there was no officer safety implicated. Now, if the officer had reached down and grabbed the cash and manipulated it or touched it in any way, clear that would have been a constitutional violation under a Supreme Court president like Dickerson. But what happened here was that, instead of reaching down, he asked the individual, what is it? Now, we would submit that that question was impermissible, and that question exceeded the scope of the stop. And within the traffic stop component of this incident, that was the one point where we took some umbrage and found, would submit to the court that this went beyond the Fourth Amendment strictures or permissible behavior by the officer. But what's more interesting in this case is what happens when the traffic stop component is over. Now, the Nevada Highway Patrol, and I will give them their kudos, has come up with a scheme or a plan to engage in these interdiction manners in a way that they believe comports with the Fourth Amendment. After trial and error, and we've had a lot of experience with Nevada Highway Patrol stops in federal court and state court in Nevada, after a lot of trials and tribulations and granted suppression motions, they've come up with this plan, if you will, of how they're going to conduct these stops. And what they do is they do this traffic stop encounter, ask as many questions as they feel they can within the scope of that encounter, and then they make a determination, and it's explicit in the record here, Officer Owens and Benson got together, huddled and said, we think there's something going on here, we want to try to do a consensual search. So what they do at this point is they tell the person, okay, we're done here, you're not going to get a citation, have a nice day, you're free to leave. And they didn't say free to leave in this case, they said we're done here. Now what Nevada Highway Patrol wants the court to believe and what the U.S. Attorney wants the court to believe is that a reasonable person, under the objective standard test that we all agree applies here, that a reasonable person would feel free to leave at that point. And here's what happened, they said we're done here, everybody turns away from each other, begins walking to their respective vehicles, the officers, our client, and his passenger, Mr. Sutton. And then the officer says, oh, can I ask you some more questions? Now this is a crucial fulcrum point in this analysis because what we need to, what the court needs to determine is, does the reasonable person feel free to leave at that point? Let's assume, before we get there, that asking what was the bulge in the pocket didn't exceed the scope. What, before the fulcrum point you're discussing, what kind of information was elicited by questioning? Well, to make the government's case, they did come up with some inconsistent stories between my client and the passenger. There is the significance, whatever significance you want to attach to the fact that they had cash, and whether or not that's permissible ground for the court to look at in a reasonable suspicion analysis depends on whether the question was permissible. Assuming that it was, they had the cash, they had inconsistent travel stories, they had the evidence of a citation on the way to Arizona the day before when the driver was saying he'd been there for a week and the driver couldn't remember the name of his cousin. So essentially they had some discrepancies about the travel stories, they had the cash, and they had the fact that somebody was driving from Idaho to Phoenix and back. Well, as a progression, if we take a look at Chavez Valenzuela, is this going beyond mere nervousness and giving rise to reasonable suspicion to extend the stop? We would submit no. The government would submit yes. It's a multi-factor totality of the circumstance calculus. Now the magistrate court made alternative holdings here. The first holding was that the protracted stop after the traffic stop was over was consensual. Then Mr. Sanchez voluntarily agreed to further encounter, in which case the reasonable suspicion analysis isn't relevant. But the magistrate also found in his report recommendation that, okay, barring that, they had reasonable suspicion to detain him regardless of his consent. So I have two hurdles. Right, but I was directing your attention to the second. Right. And in the second part, we would submit that it's a very close case. The government can certainly muster up, and they did muster up a fair amount of evidence at the evidentiary hearing, tending to demonstrate some suspicion. We would argue, and there's no – search and seizure cases are interesting because there never seems to be any cases directly on point because they're kind of like snowflakes. I mean, everyone is different, and they all have different factual circumstances. You have to look at them. You say that about fingerprints, but now we're not sure about fingerprints. Exactly. But the – back to the point here. We would submit that we were just a little low, short of the line of reasonable suspicion. The government would say they were just over. When did the dog arrive? The dog arrived – Sequencing. Well, the dog's, you know, in the wings, if you will. Part of the scheme is the guy with the dog is in the vicinity and ready to go at a moment's notice to any of these stops. They called him up on his cell phone. He was there within three minutes, according to the record. So before – was that – did the dog arrive before the – and start sniffing before the consent fulcrum point that you were – After. After. Right. And as the government would point it out in their brief, and this is correct, there's nothing wrong with having the dog sniff around the exterior. That's not a search. And that's where the dog alerted to the tail. Right. But what is permissible, perhaps, is making Mr. Sanchez hang around long enough to let the dog do it. Right. And whether the prolonged detention was appropriate until the dog alerted, at which point. Everybody seems to agree there's probable cause for arrest. Once the dog alerts, they have enough for an arrest. So really what we have here – and I'm going to try to reserve the rest of my time for rebuttal, if I may – is a totality of the circumstances analysis on the reasonable suspicion, which is a more traditional Fourth Amendment analysis. The more interesting question here is whether or not the prolonged detention was consensual. And the one point I'd like to make before I sit down is that there is – the Supreme Court has given us some indication that there's a problem when law enforcement comes out with a systemic plan to try to circumvent constitutional protections. And I would note the Siebert case, the Fifth Amendment case, where the Supreme Court had a problem with a contrived plan by law enforcement to circumvent constitutional protections. Not to mention the Williams case in this circuit. Right, exactly. Which clarifies the test we need to use in those circumstances. And I would submit that this Court should have a problem with that. And I would like to reserve the rest of my time for rebuttal, if I may. Good morning, and may it please the Court. My name is Patrick Walsh. I'm an assistant United States attorney, and I represent the United States in this case. Do you agree that Nevada is going through this two-step process that they devised to – as a way to comply, in their view, with the consent, voluntary search after a – after a stop? The officers acted, in this case, in an effort to comply completely with the Fourth Amendment. That's correct. I'll assume that they tried, but is there – is this part of a program that they've adopted? Yes. Yes. Oh, yes. So is walking away and then turning around and saying, oh, by the way, that is part of an actual policy and practice that they've adopted? These officers have been trained that their authority to detain for a traffic infraction is very limited. And so once they've completed their investigation, they need to either have reasonable suspicion to prolong the detention or release the defendant and make sure that the defendant understands that he is free to leave before they attempt to ask additional questions. And they can do both if they want. How did they make it clear on the latter part? I'm just curious. The counsel made a slip of the tongue and said – they said to him, you're free to go. No, actually, what they said is we're done here. Now, if they're as careful and planning about this, why isn't there almost like a Miranda warning that they've adopted, which said, look, you are absolutely free to go. We can't hold you. You may leave, as opposed to we're done here, turning around and then mailing them with a request to search. Well, I think that the officers are aware that the Fourth Amendment requires that they communicate in some way to let the motorist know that the traffic infraction is over. The Supreme Court has told us in Ohio v. Robinette that they overruled the Ohio Supreme Court that said in order to do that, you have to tell them they're free to leave. And so the Supreme Court has told us that you don't have to use the words, you're free to leave, although clearly that would be one way to communicate it. And this officer – Let me take you back to the traffic stop part of it. Because there's three questions that particularly bother me. Once he made the pat-down, that's legitimate. There may have been firearms in his pocket or some other item that would injure the sheriff. But then he says, what's in there, after he feels it and is satisfied that there's not a firearm in there? What business is it of the officers in connection with the traffic stop, what's in his pocket without a warning, right? Is that part of the traffic stop? Is this investigation? It was the officer saw something suspicious. He saw an extremely large bulge in someone's pocket. That's right. And he put his hands on it. It was not a firearm. So what was he worried about? Is there anything in the record that expresses his worry about the traffic stop that has something to do with what's in a pocket? So he asks the question, what's in the pocket? Is that a legitimate question in connection with the traffic stop? Yes, Your Honor. And I have two responses. First is the context. Remember, this the officer asked permission to conduct a pat-down, and Mr. Sanchez granted it. So this was a consensual pat-down at this point. Pardon me? Pat-down. That's correct. But that's not asking what's in the pocket. That's true. That's the next question. That's true. However, in the United States – oh, I'm sorry, sir. Let me go to the second question that bothers me. What's your cousin's name? What's that got to do with the traffic stop? Again, the officer, when confronted with something that appears to be suspicious, can ask questions to confirm or dispel. The Supreme Court told us that. Does it have anything to do with driving the car? Does it have anything to do with the broken window? Does it have anything to do with the television? That was the reason for the traffic stop that is given. So what's the cousin got to do with it? Well, the officer – at this point, the officer is seeing very suspicious factors more and more as it goes along. Now, what is he seeing? He's seeing the money. Well, he saw the money. That comes back to Judge Brees' original question. Yes, sir. And the answer to that is when an officer sees something suspicious, like a very large bulge in the pocket, which could be anything. It might not be a weapon. It might be drugs, obviously. It could be something totally innocuous. It's not unreasonable for an officer to ask what that is. The question – The officer's got another question in connection with the traffic stop. What's your past employment? What difference does it make what he did one year or five years or ten years ago or who he was previously employed by in connection with a traffic stop? Can't the officer resolve the traffic stop without knowing what kind of work this guy did before? The record I submit actually is not directly clear on whether the officer asked that question or the defendant volunteered it. In fact, in the record, I believe that was a question asked to the passenger by Detective Sergeant Vinson about after the Detective Sergeant Vinson found the Arizona citation and got identification from the passenger. He asked the passenger what their jobs were. This Court has held in other cases that questions about employment, if not directly, has indirectly held that are permissible. I'm trying to look at them engrossed because what the officers are doing is putting together a whole bunch of questions looking for conflict that have nothing to do with the traffic stop. It's a bruise, isn't it? Is it – well, they're trying to figure out what's going on and if there's anything suspicious going on. Well, sure they'd like to know what's going on. They'd like to find a crime if they could. But their reason for stopping is that there's been a traffic violation and the traffic violation is showing a TV screen available to the driver and a crack in the windshield, right? That's it. So they can ask him, how'd you crack your windshield? Or who turned on the TV? And they know everything they want to know about the traffic stop. They can write up the ticket and send him on his way. Well, this other stuff is collateral. I would say it's a very – it would be a very big step for this court to say that any officer in any traffic stop cannot ask non-accusatory questions. I mean, officers all the time in routine traffic stops while they're waiting for records checks might talk to the driver. They might ask him about something they saw in the car. They clearly might ask him where they're coming from and where they're going. These are not questions that would make someone feel that they're being accused of a crime. They're conversational questions. There was nothing coercive about the way they were asking these questions. The record is very clear. What if the defendant says none of your business? He has every right to say that. Absolutely. And then if he says he wants to leave, they have to let him go, and they do let him go. That's absolutely right. He has that right to not answer the questions. And there's no argument here that he was forced to answer or coerced to answer or that he was being even pushed to answer. These were very conversational questions that the defendant responded to. Again, he was asked permission to pat him down, and he consented to that. He was asked permission to remain and answer some other questions, and he agreed to do that. In fact, he walked back to the officer. The whole tone of the stop was a non-pushy, non-accusatory, and these questions were very normal questions or routine questions that someone might encounter on any traffic stop. Now, clearly, if he was asking about drugs or accusing him of some criminal activity, that might raise concern to the court, but questions about where you're coming from and where you're going are pretty routine. What do you do for a living? These are things that you might ask someone you encounter on a bus or on the street. Well, on the sequencing of these questions and the way it was, you'd say they were casual conversations, and I wasn't there. But I have trouble with the notion that this little dramatic ploy that they engaged in turns what was a completed traffic stop somehow into a consensual search. Well, first, to have somebody questioned by the police officers with all of the paraphernalia around and then to say, oh, by the way, and because the defendant walked toward the officer to suggest that somehow, oh, he clearly knew that they were free to leave, I think it's a hard psychological drama to follow. There's very little more an officer can do, and the Supreme Court in Ohio v. Robinette suggests that they can turn a traffic stop into a consensual encounter. And so if you can turn a traffic stop into a consensual encounter, then this clearly should be sufficient to do that. Well, only if a reasonable person under the circumstances would have felt that they were in fact free to go. And my suggestion is my problem with the case anyway. I have real trouble on this particular scenario here. That's the driver of his car thought he was free to just walk away and turn back on the car. Well, if Mr. Sanchez was feeling coerced into acquiescing to the officer's questions, he would have immediately granted consent to search the car, but he didn't. When the officers asked the officer, do you have any baggage? Yes, I have some bags. Can I search your car? You can look at my bags. He told him twice, you can look at my bags. Never answered the question, can you search the car. Sounds like he didn't feel he could actually walk away. He could be like cat and mouse with him. Well, I think he was deciding what he wanted to do. I think that's a more correct answer. Okay. Well, I hope we've got the argument, and we'll allow your opponent to have some rebuttal. Thank you. He may take a different view. Just along the lines of the larger theme of where the question is asked here in the traffic stop stage permissible, one thing I was remiss to point out is that why are they questioning the passenger at all? They're pulling the Susanna and the elders thing here where they're pulling them both apart and trying to get inconsistent stories. We all can pretty much conjecture that has nothing to do with the cracked windshield. There's nothing that Mr. Sutton can tell them that's going to help them determine whether or not that cracked windshield is obscuring the field of vision of the windshield. And to end this. Is it your position that in a traffic stop, the only permissible questions are those related to the actual violation, suspected violation, and that they were pulled over for? This Court's presence seems to indicate that there are questions, regulatory questions related to that inquiry that are permissible. And when I say that, I mean travel itinerary questions are okay because those would be somehow related to whether or not you're lawfully on the road and the state of your driver's license and where your car is registered. The Garcia case from this Court seems to indicate that questions regarding travel itinerary seem to be okay. The case law also seems to indicate that once we get a field from that, then we enter into impermissible territory. And here I would submit that the questioning of the passenger and the questions about the money and the questions about your family relations all exceeded the scope. And as my last point, if those questions are impermissible, the information learned from those questions has to be extracted from the reasonable suspicion analysis. And I submit that once you do that, you would find that there wasn't reasonable suspicion to detain my client any longer. Thank you. All right. Thank you both for the argument. Well argued, and we appreciate the argument itself.
judges: B. Fletcher, Beezer, Fisher